Rosemary SEBASTIAN

v.

TEXAS DEPARTMENT OF CORREC-
TIONS, W. J. Estelle, Jr., and
Ralph E. Gray, M.D.

Civ. A. No. H–81–2112.

United States District Court,
S. D. Texas,
Houston Division.

March 18, 1982.

Eliot P. Tucker, Mandell & Wright, Evelyn Jo Wilson, Susman & McGowan, Houston, Tex., for plaintiff.

Theresa Ann Kraatz, Chris Hanger, and James R. Meyers, Asst. Attys. Gen., Austin, Tex., for defendants.

## ORDER

CARL O. BUE, Jr., District Judge.

Plaintiff, a female currently employed by defendant Texas Department of Corrections, has moved the Court to enter a preliminary injunction ordering that she be reinstated to her former position, complete with all of the responsibilities and authority that she had before she was demoted. Also included in her request are restoration of salary level, access to facilities of the Texas Department of Corrections which is necessary to carry out her duties, return of her office location, expunction from her records of any reference to the demotion, removal from her personnel file of a particular incident report regarding the media, permission to use the pool vehicles of Texas Department of Corrections, prohibition of any future discrimination based on sex, payment of back pay, and restoration of lost vacation and holiday time. Lastly, a primary request by plaintiff is that the Court order that she be permitted to participate fully in the implementation of the consent decree in the *Ruiz* case. For the reasons stated herein, the Court grants plaintiff's motion for a preliminary injunction, but with modification which in the Court's opinion is appro-, priate under the circumstances.

### A. Statement of Facts

Plaintiff was first employed by the Texas Department of Corrections in April 1980 as a Staff Services Officer I with the title of Assistant Administrator of Medical Support Services. She holds a bachelor's degree and is currently engaged in a master's degree program in health care at Trinity University. Additionally, she holds three certificates in health care and health care administration.

Plaintiff was promoted in July 1980 to Staff Services Officer II, becoming the Administrator of Medical Support Services. Up until September 1, 1981, she retained that position, with intermittent pay raises. The title was changed in April 1981 to Administrator of Health Services, but the position and responsibilities remained unchanged.

In July 1980 when plaintiff became Administrator of Medical Support Services, the department in which she was employed was known as the Directorate of Treatment. There were two persons to whom she directly reported: Ron Taylor and Dr. Ralph E. Gray. These two reported directly to Mr. W. J. Estelle, Director of the Texas Department of Corrections. In April 1981 this directorate was severed, and Dr. Gray was placed in charge of the Directorate of Health Services. Thereafter, plaintiff reported directly to Dr. Gray.

Dr. Gray is the Assistant Director for Health Services and in such capacity is responsible for the health care of all the prison units in the Texas Department of Corrections. Accordingly, it is Dr. Gray who is responsible for designing and implementing the plans necessary to comply with the *Ruiz* consent decree with regard to health care for the inmates.

On June 26, 1981, Dr. Gray gave plaintiff a written performance evaluation which covered the period of April 1980 to April 1981. Generally, the rating was above average, and specifically Dr. Gray marked the middle box in the category evaluating cooperation which indicated that she was

"[p]leasant to work with. Promotes harmony." In the section regarding promotion, Dr. Gray marked the box "Capable of increased responsibility. Consider for promotion ahead of contemporaries." Plaintiff's Exhibit 6.

In mid-July Dr. Gray decided to reorganize the directorate so that all of the administrative heads of the divisions were placed on a co-equal level reporting directly to him rather than through plaintiff, the Administrator of Health Services. This reorganization included the demotion of plaintiff and the replacing of her with Richard Bader, a person who had formerly been employed in a subordinate position under plaintiff. This demotion became effective on September 1, 1981. Dr. Gray discussed the reorganization and plaintiff's demotion with Mr. Estelle who approved of the decision. Dr. Gray explained that the reason for plaintiff's demotion was his belief that it would improve relations between the Health Services Directorate and other staff personnel. Plaintiff learned of the demotion on July 26 when Dr. Gray went to her home in order to inform her of his decision. At first he gave her no concrete reasons for the demotion, but thereafter, at plaintiff's request, he put the reasons in writing. Plaintiff's Exhibit 18.

There was some confusion about the number of pay levels that plaintiff would be demoted. Indeed, Dr. Gray initially did not intend that she be demoted at all but simply that her position be changed so that she would work under Richard Bader. At first she was demoted three pay levels with loss of emoluments,[1] but this reduction was later modified to a demotion of one pay level with no loss of emoluments. In addition to demoting plaintiff in pay level, Dr. Gray created a new position for her which

required that she move to another office location over a mile and a half away. Richard Bader thereupon was placed in the office that plaintiff formerly had occupied next to that of Dr. Gray.

From the time Dr. Gray evaluated plaintiff until her demotion, there was no change in her job performance, nor did Dr. Gray acquire any information that would have changed the evaluation. He did not criticize her in any respect, nor did he offer any suggestions for improvement in any area. Thus, plaintiff had no notice of any deficiency which might have caused her demotion.

During the year that plaintiff worked under both Dr. Gray and Ron Taylor, there were complaints from the medical staff at the University of Texas Medical Branch (hereinafter "UTMB") at Galveston about how Taylor and plaintiff treated them as employees of the Texas Department of Corrections.[2] This situation was alleviated when a division head was created within the Health Services Directorate for the sole function of maintaining liaison with the UTMB. Also, there were complaints about plaintiff from other assistant directors and wardens—all male—who claimed that plaintiff was exceeding her authority and at times was overriding theirs. The warden of the Huntsville Unit was especially critical of plaintiff. In particular, he objected to allowing plaintiff to enter the Huntsville Hospital or the dining room at the Huntsville Unit. In early 1981, Director Estelle directed that plaintiff be allowed to enter the hospital to perform her duties, and thereafter she was allowed to do so on a limited basis with a male escort. However, she was not allowed in the dining room.

Dr. Gray testified[3] that the assistant directors and wardens who complained about

1. At the prison units, animals and vegetables are raised for food, and the employees of the Department of Corrections who are eligible to participate are allotted a certain amount of these products per month. The privilege to participate in this distribution is called "emoluments."

2. The Texas Department of Corrections and the UTMB have a program to coordinate efforts to

train certain personnel for the Texas Department of Corrections, and, also, the UTMB supplies a number of hospital beds for certain classes of ill inmates.

3. The Court explicitly ruled at the end of the hearing that the depositions, excerpts of which counsel had planned to read into the record, would be considered by the Court in making its decision.

the plaintiff harbored a male chauvinistic attitude and that this attitude was built into the system. He presumed that the reason the Huntsville warden would not allow plaintiff into the hospital was because plaintiff was a female. Had she been a male, the level of resentment in Dr. Gray's opinion would not have been as high, nor would there have been pressure on him to demote her.

Another source of difficulty was that the plaintiff in an attempt to carry out Dr. Gray's directions in implementing the *Ruiz* consent decree was hiring more accredited nurses to work in the hospitals. The purpose of this effort was to bring the Texas Department of Corrections into compliance with the minimum standards set by the American Medical Association. The hiring of additional accredited nurses necessarily meant the hiring of more females because the percentage of males in that profession is relatively low. This was one of the reasons why the assistant directors and wardens were opposed to plaintiff's remaining in the position that she occupied.

After being told of the demotion, plaintiff initiated the internal grievance procedure and talked with Estelle and Dr. Gray. Plaintiff filed a timely charge of discrimination with the Equal Opportunity Commission, Plaintiff's Exhibit 58, and a right to sue letter was issued. Plaintiff's Exhibit 56. This suit was then filed.

At the hearing on the motion for a preliminary injunction, counsel for the defendant Texas Department of Corrections announced to the Court that the defendants had agreed to reinstate plaintiff to her former level and job title, to restore her responsibilities which she had prior to September 1, 1981, as set out in the job description for Staff Services Office II, to continue to assign her duties appropriate to that position, to restore her salary level, to permit her access to the facilities of the Texas Department of Corrections as required to carry out her duties, to expunge her records of any reference to her demotion, to remove from her file the incident report regarding communication with the media, to refrain from discriminating against her on the basis of sex, to permit her access to the pool of vehicles owned by defendant, and to reimburse her for back pay, said amount being the difference between the salary level she was to have assumed on September 1 and her current salary level in effect at the time of the hearing. See Exhibit A attached. When comparing the items requested by plaintiff, this agreement effectively satisfies all but three of those requests: return to her former office location, restoration of lost vacation and holiday time, and, most importantly, her full participation in the decisions concerning the implementation of the health care aspects of the consent decree in *Ruiz*. Defendants vigorously oppose the last item because they see this request as affording the plaintiff the right to define the scope of her duties and authority which is tantamount to the power to limit her supervisor, Dr. Gray, in his management of the Health Services Directorate. Defendants contend that granting this request would constitute an unwarranted and unreasonable intrusion by the Court into the Director's managerial discretion and authority.

### B. Requirements for Preliminary Injunction

■ The granting or denying of a preliminary injunction rests in the sound discretion of the district court, but this discretion must be exercised in view of four prerequisites:

(1) a substantial likelihood that the plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to the plaintiff outweighs the threatened harm an injunction may cause the defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Clements Wire & Mfg. Co., Inc. v. NLRB*, 589 F.2d 894, 897 (5th Cir. 1979). The Fifth Circuit has ruled that irreparable injury will be presumed in Title VII cases where it is shown that the statute has been violated.

*United States v. Hayes International Corp.,* 415 F.2d 1038, 1045 (5th Cir. 1969). A recent appellate case has held that this principle applies as well to plaintiffs who are state employees when the employee has exhausted all administrative remedies. *Middleton-Keirn v. Stone,* 655 F.2d 609, 612 (5th Cir. 1981).

▉ The determination by the Court of plaintiff's likelihood of succeeding on the merits need not be one of absolute certainty:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present, ... it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.

*Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953); *Held v. Missouri Pacific Railroad Co.,* 373 F.Supp. 996, 1003 (S.D.Tex.1974). However, this must be taken in the context that a preliminary injunction is an extraordinary remedy and should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party. *Exhibitors Poster Exchange v. National Screen Service Corp.,* 441 F.2d 560, 561 (5th Cir. 1971).

▉ In the present case the Court finds that plaintiff has presented sufficient evidence to show a substantial likelihood of prevailing on the merits.[4] At trial the plaintiff would establish a *prima facie* case by showing that (1) she belonged to a protected class; (2) she was employed by defendant and was doing apparently satisfactory work; (3) she was involuntarily demoted; and (4) she was replaced by a male.

*Jones v. Trailways Corp.,* 477 F.Supp. 642, 645 (D.D.C.1979). This was easily shown by plaintiff. Plaintiff was evaluated favorably and then with no notice of needed improvement she was demoted two months later. Defendant's rebuttal, that plaintiff was difficult to get along with, could be a legitimate non-discriminatory reason. But plaintiff's evidence of pretext was very strong. Dr. Gray admitted that plaintiff's sex had a bearing on his decision to demote her, that the other assistant directors and wardens who were males resented plaintiff but would not have resented a male doing the same things, and that her hiring of female nurses in an attempt to comply with the *Ruiz* decree was one of the reasons they were opposed to plaintiff's remaining in the position she held. Deposition of Dr. Gray.

▉ Further, plaintiff presented evidence that there is statewide discrimination against female employees in the Texas Department of Corrections. The males in administrative positions are able to use the company vehicles but females are not; the males are given job benefits such as haircuts, shoe shines, laundry and dry cleaning services at reduced prices which are not offered to female employees; in some units, for example Huntsville, the females are excluded from the dining hall. Although the last may justifiably be for security reasons which will be determined at a trial on the merits, the other items raise serious questions and even strong indications of discrimination. The reprobated reason need not be the sole basis for the defendants' action to warrant relief, but it must be a significant factor. *Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir. 1980). All of the circumstances are sufficient to indicate that plaintiff's sex was indeed a significant factor and certainly sufficient to satisfy the Court that there is a substantial likelihood that plaintiff will prevail on the merits.

---

4. As to each alleged act of discrimination, the plaintiff has the burden of establishing a *prima facie* case of discrimination. Once a *prima facie* case has been established, the burden to articulate some legitimate, non-discriminatory reason for the action shifts to the employer. Upon rebuttal evidence being offered, the ultimate burden of persuasion by a preponderance of the evidence that discrimination has taken place and that the proffered reasons are but a pretext falls upon the plaintiff's shoulders. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ With regard to the second pre-requisite, irreparable harm as stated above will be presumed from the very fact that the statute has been violated. *Middleton-Keirn v. Stone, supra.* The plaintiff has exhausted her administrative remedies and has made a sufficient showing of success on the merits, and, accordingly, the Court is obligated to find that irreparable injury is presumed to have occurred for purposes of plaintiff's motion for a preliminary injunction.

■ The third factor, balancing of harm, must tip in plaintiff's favor. Plaintiff's reinstatement will not disturb the reorganization that Dr. Gray has instituted. If he could create a position for her in September 1981, it would seem reasonable that he could position her into the structure now. Although Mr. Estelle has the final approval, it would appear from the evidence that he gives his assistant directors discretion in making their organizational decisions. Further, plaintiff's skills and talents would be an aid to his upper level staff, as Dr. Gray testified[5] and as the evaluation indicated. *See also* Plaintiff's Exhibit 6.

The defendants claim that harm will be done by reinstating plaintiff because there will be discord and animosity if she is restored to the position that she held. Antagonism between parties occurs as the natural bi-product of any litigation. Thus, a court might deny reinstatement in virtually every case if it considered the hostility engendered from litigation as a bar to relief. *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1139 (8th Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981). The evidence indicates that the discord, at least in part, was generated by the very fact that plaintiff is a female, that the male counterparts resented her and wanted her out. This is the very reason to reinstate her. Further, any injury done to the harmony of defendants' working atmosphere is certainly outweighed by the great harm done to plaintiff in terms of her professional career

and her reputation in general. Hence, the third factor, that the threatened injury to the plaintiff outweighs the threatened harm that an injunction may cause the defendants, is satisfied.

■ The last factor is easily satisfied in view of the aims of Title VII litigation. The statutes enacted by Congress under 42 U.S.C. § 2000e *et seq.* are for the purpose of eliminating discrimination on the basis of race, religion, sex, or national origin, and a preliminary injunction reinstating plaintiff would serve rather than disserve the public interest. Additionally, assuming she is directed to participate in the project, the talents and skills of plaintiff can be more utilized on the *Ruiz* decree from the position she seeks. This, too, would serve rather than disserve the public interest.

■ In summary, the Court concludes that all four necessary factors have been satisfied and that plaintiff's motion for preliminary injunction should be granted. However, as set out more fully below, the motion as stated will not be granted *in toto*, but will be modified by the Court as required to do equity for all concerned.

### C. Reinstatement

■ The United States Supreme Court has held that consistent with the congressional plan one of the central purposes of Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). To effectuate this "make whole" objective, Congress in § 706(g) vested broad equitable discretion in the federal courts "to order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without pay . . ., or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g) (1981). In *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 96 S.Ct.

---

**5.** As stated in note 3, the Court is considering the deposition testimony submitted in post-trial briefs in its decision.

1251, 47 L.Ed.2d 444 (1976) the Supreme Court, quoting from the house report accompanying the bill, noted:

> The provisions of [§ 706(g) ] are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. . . . [T]he Act is intended to make the victims of unlawful employment discrimination whole, and . . . the attainment of this objective . . . requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination.

424 U.S. at 764, 96 S.Ct. at 1264. Hence, the district court not only has the power but also the duty to render a decree which will restore the injured plaintiff to a position which she would have occupied but for the unlawful discrimination. The determination of whether reinstatement is an appropriate remedy lies within the sound discretion of the trial court. *Hedrick v. Hercules, Inc.*, 658 F.2d 1088, 1095 (5th Cir. 1981). In the present instance evidence shows that plaintiff's position before demotion was Staff Services Officer II, and defendant Estelle has agreed that plaintiff will be restored to this very position. See Exhibit A attached. Further, defendant Estelle's order restores to her the same responsibilities, duties and authority of a Staff Services Officer II as she enjoyed prior to her demotion. *Id.* However, this order does not direct that she replace Richard Bader or that she be co-equal with Richard Bader. Neither does it specify what duties with regard to the *Ruiz* decree would be attributed to plaintiff's position.

To make plaintiff whole, she would have to occupy a position immediately subordinate to Dr. Gray, since this is the level of authority that she held prior to September 1. Therefore, appropriate reinstatement dictates that she be placed not only in the position of a Staff Services Officer II but also that she be designated a division head co-equal with the other assistant administrators in the Health Services Directorate. Such action does not require that Richard Bader be removed but only that plaintiff be restored to a position in the administrative structure immediately under Dr. Gray with the same duties and responsibilities assigned to her as she possessed when she was placed in that position originally. That job is Administrator of Health Services and is described in Plaintiff's Exhibit 1. See Exhibit B attached. This job description was prepared by plaintiff and approved by Dr. Gray in April 1981 when Dr. Gray took over the newly formed Health Services Directorate. Testimony of plaintiff; Deposition of Dr. Gray. Clearly the reading of the document reveals that the employee holding the position has a subordinate function and is to carry out the orders of the head of the department. In short, Dr. Gray is to set the policies, and plaintiff is to carry them out. Other items in the job description give the plaintiff first-hand responsibility for coordinating, evaluating, planning, reporting, and the like, but all of the ultimate policy decisions originate with Dr. Gray.

The general job description for the position of Staff Services Officer II, a position found in all of the directorates, uses similar language. The person "directs and coordinates," "assists," "develops," "prepares,"— all functions, but the exercise of such authority is still in a subordinate capacity. Plaintiff's Exhibit 7. The job description further provides that the employee "assists in planning and carrying out policies for activities directed and in interpreting and adopting state and federal standards and regulations." This could encompass work on the *Ruiz* decree, but it would be under the direction of her superior, Dr. Gray. The Court cannot order Dr. Gray to place plaintiff specifically on the *Ruiz* project when the job description does not reflect that her previous job included such duties. Only plaintiff's own description of her previous job, which she herself drafted after the litigation began, makes mention of the *Ruiz* project. Plaintiff's Exhibit 55. Following the dictate of *Albemarle Paper Co.*, this Court must see that plaintiff is reinstated to a position which is comparable to the one that she would have occupied if her demo-

tion had not occurred, but plaintiff may not dictate the conditions under which she should be offered reinstatement. *Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1030 (6th Cir. 1977). Hence, plaintiff's request that the Court direct that she be allowed to participate fully in the planning and implementing of the *Ruiz* decree is denied. Such decisions in this regard are left to Dr. Gray.

■ Equity controls the fashioning of relief when any preliminary injunction is granted, and the Court must shape the relief to avoid any injustice. As stated in *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40, 41 (5th Cir. 1974), *rev'd on other grounds*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), "[F]lexibility and careful tailoring of judicial decrees in Title VII cases are the order of the day." This Court has great reluctance to invade the areas of management and internal affairs of defendants. The specific removal of Richard Bader will not be ordered unless the restoration of plaintiff to her rightful position cannot be accomplished without his removal. Defendants certainly retain the right to effect organizational changes that are deemed necessary for efficient management, but they may not demote plaintiff in the process for the sole reason that she is a woman. It appears that Dr. Gray felt he needed the assistance of both plaintiff and Richard Bader to effectively fulfill the needs of the directorate, and there seem to be funds available for both salaries. Although the defendants argue against plaintiff's reinstatement to her exact prior position because of hostility and animosity, the Court cannot deny the remedy on this basis alone.[6] To deny reinstatement merely because of the existence of hostility engendered by the prosecution of a discrimination suit would frustrate the make-whole purpose of Title VII. *Taylor v. Teletype Corp., supra.*

As to the relationship between Dr. Gray and plaintiff, counsel for Dr. Gray at the hearing informed the Court that both Dr. Gray and plaintiff have continued to work well together. Plaintiff verified this situation. Therefore, it is the intent of this Court that plaintiff be reinstated to her former position of Administrator of Health Services, immediately subordinate to Dr. Gray and co-equal with Richard Bader, without the removal of Richard Bader. However, if this cannot be accomplished and a choice must be made by the defendants between plaintiff and Richard Bader as to who must remain and who must leave, Richard Bader must leave. As stated by the Supreme Court,

> [W]e find untenable the conclusion that this form of relief may be denied merely because the interests of other employees may thereby be affected. 'If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed.' *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 633 (CA2 1971).

*Franks v. Bowman Transp. Co., supra*, 424 U.S. at 775, 96 S.Ct. at 1269. Although the Court would do equity and avoid injustice to anyone, removal of an incumbent has been upheld in the Fifth Circuit to accomplish reinstatement of a victim of discrimination. *McCurdy v. School Board of Palm Beach County, Florida*, 367 F.Supp. 747 (S.D.Fla.1973), *aff'd*, 509 F.2d 540 (5th Cir. 1975).

There are two remaining items sought by plaintiff not yet discussed: restoration of lost vacation and holiday time and return to her former office location. The effect of withholding salary and causing an employee to use his vacation or holiday time for the time spent by the employee in his participation in discrimination proceedings is a pen-

---

**6.** Compare the position taken by the Fifth Circuit in cases brought under 42 U.S.C. § 1983. In *Sterzing v. Fort Bend Ind. Sch. Dist.*, 496 F.2d 92 (5th Cir. 1974), the trial court declined to grant reinstatement on the basis that it would be too antagonistic. The Court of Appeals held that this was an impermissible ground for denying the remedy, stating, "Enforcement of constitutional rights frequently has disturbing consequences. Relief is not restricted to that which will be pleasing and free of irritation." 496 F.2d at 93.

alty. It would tend to discourage employees from testifying in such proceedings or from seeking the very remedies to which victims of discrimination are entitled. *Kyriazi v. Western Electric Co.*, 469 F.Supp. 672, 674 (D.N.J.1979). Hence, since the absence of the plaintiff from her job was necessary to prosecute this action and since the time spent was reasonable in amount, the Court orders that as part of the injunction defendants return to plaintiff the compensation which she has lost in terms of vacation and holiday time. The defendants may choose whether they will return this to plaintiff in the form of monetary compensation or as time credited toward her vacation and holiday periods.

The last item is the office location. The Court views this change in location, placing plaintiff in a distant office a mile and a half away from the head of the department, as a tangible symbol of plaintiff's demotion. As long as she remains there, all will remember the incident and recall its significance. Likewise, to be replaced in the office that she occupied previously is a symbol of reinstatement and will have a psychological effect on all immediately involved. Following the same rationale set out above, the Court concludes that if there is a choice to be made between Richard Bader and plaintiff, plaintiff must prevail in order to be made whole. If there is a space problem and one must office in the annex, it shall be Richard Bader. Further, this will be no problem at all if defendants find that there can be only one Administrator of Health Services because that position belongs to the plaintiff.

### D. Conclusion

In summary, the Court concludes that reinstatement is the remedy to make plaintiff whole and will restore her to the position that she would have occupied but for the discrimination. Plaintiff shall be restored to the position of Staff Services Officer II but, more specifically, to Administrator of Health Services with all the attendant responsibilities and duties set out in the job description prepared for that position in April 1981. However, the Court does not order that plaintiff be specifically allowed to participate as she decides that she should in the *Ruiz* decree, but as Dr. Gray decides that she should. The Court directs that plaintiff be compensated, either in time or money, for the vacation and holiday time that she spent participating in the present proceeding. Lastly, the Court orders that plaintiff be placed in her former office location next to that of Dr. Gray.

The Court hereby acknowledges and approves the other aspects of reinstatement offered to plaintiff by defendant Estelle in his order dated February 2, 1982.[7] The remedy granted herein is in addition to that offer made by defendant Estelle.

### APPENDIX

#### EXHIBIT A
#### TEXAS DEPARTMENT OF CORRECTIONS
**Inter-Office Communications**

From W. J. Estelle, Jr.      Date   February 2, 1982
To    Dr. Ralph E. Gray      Subject Request for Personnel Actions
      D. V. McKaskle
      Bobby Maggard                 (Rosemary Sebastian)

The following actions will be taken in regard to the employment status of Rosemary Sebastian:

1) Restore to the position *level* she held before 1 September 1981, (Staff Services Officer II).

2) Restore her to the responsibilities, duties and authority of a Staff Services Officer II, the position she held prior to 1 September 1981. Exhibit A describes those responsibilities, duties and authority.

3) Assign her duties, responsibilities and authority that are appropriate for the position to which she is being reinstated.

4) Restore her to the salary level and benefits she was to have assumed on 1 September 1981.

5) Permit access to units and facilities of the Texas Department of Correc-

---

7. A copy of that order is appended hereto as Exhibit A.

tions as required to carry out her assigned responsibilities.

6) Provide office space commensurate with her responsibilities.

7) Expunge all Texas Department of Corrections records of any reference to her demotion or its accompanying effects except historical financial audit records.

8) Permanently remove from her personnel file the incident report regarding communication with the media.

9) Refrain from discriminating against her on the basis of sex.

10) Permit her access to and use of Texas Department of Corrections "pool" vehicles on a basis equal to that of male employees at her administrative level, and in accordance with the duties needed to be performed.

11) Reimburse as back pay the difference between the salary level she was to have assumed on 1 September 1981 and her current salary level in effect prior to reinstatement action.

Very truly yours,
(s) W. J. Estelle, Jr.
W. J. Estelle, Jr.

EXHIBIT A

Class No. 1553

## STAFF SERVICES OFFICER II

### GENERAL DESCRIPTION

Performs highly responsible administrative and staff service work in a large facility or state agency with a complex organizational structure and extensive field operations. Work involves planning, directing, and coordinating various staff functions such as the personnel, fiscal, property management or training activities, representing the agency or facility in negotiating and planning with federal and state authorities, and planning and carrying out special assignments. Works under direction frequently exercising initiative and independent judgment.

### EXAMPLES OF WORK PERFORMED

Directs and coordinates the personnel, fiscal, property management, and training activities of the facility or agency.

Assists in planning and carrying out policies for activities directed and in interpreting and adopting state and federal standards and regulations.

Represents the facility or agency in negotiations and planning with federal and state authorities.

Prepares regulations and procedures for functions directed.

Develops methods for evaluating employee performance.

Plans and carries out special and administrative assignments and programs in areas such as organization and management, and adopting methods and procedures to meet legislative changes and operating needs.

Prepares special reports and memoranda as requested.

Represents the facility or agency or permanent and special committees working on employment security matters.

Performs related work as assigned.

### GENERAL QUALIFICATION REQUIREMENTS

*Experience and Training*

Eight years of full-time paid employment in a public or private enterprise that provided extensive knowledge of the services, functions, organizational structure, and operational policies and procedures of the facility or the agency, including knowledge of such staff activities as personnel, accounting, fiscal and property management, or related staff activities, four years of which must have been in an administrative, managerial, or supervisory capacity.

*Education*

Graduation from an accredited college with a major course of study in personnel or public or business administration or a related major course of study.

Experience of the type specified may be substituted for required college at the rate of one year of the specified experience for each year of college, with a maximum substitution of two years.

*Knowledge, Skills and Abilities*

Extensive knowledge of public personnel administration, fiscal methods, training techniques, and modern office practices; of facility or agency policies and procedures related to activities supervised.

Ability to direct and coordinate the work of a large group of employees engaged in a variety of tasks; to analyze and solve work problems; to make decisions and delegate authority; to prepare comprehensive, accurate reports; to work effectively with a variety of individuals and groups.

9–1–76

EXHIBIT B

## ADMINISTRATOR OF HEALTH SERVICES

Provides and coordinates professional administrative management of the Health Services Directorate. Supervises departmental administration and operations.

Implements policy guidelines and instructions of the Assistant Director for Health Services. Participates in development of Policies and Procedures as part of the TDC/UTMB Medical Project.

Plans, develops, evaluates, and coordinates management systems for health care administration.

Responsible for strategic planning of services, facilities, staffing, equipment and resources.

Develops health care facilities requirements in order to assist in planning and construction programs. Prepares recommendations concerning scope, location, and design of medical facilities.

Responsible for coordinating health services staffing including the recruitment, orienta-

tion, assignment, and retention of administrative and professional staff. Responsible for directing staff development and continuing education.

Responsible for coordinating ancillary support services such as nursing, pharmacy, radiology, transportation, telemetry and rehabilitative medicine.

Responsible for gathering, evaluating and reporting information and data concerning health care needs and services.